# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUSAMUEL RODRIGUEZ MCCREARY, RICHARD C. ANAMANYA, and JOSEPH R. COPPOLA,<br><br>each individually and on behalf of all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>THE FEDERAL BUREAU OF PRISONS, THOMAS R. KANE, DAVID J. EBBERT,<br><br>DEFENDANTS. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Jusamuel Rodriguez McCreary, Richard C. Anamanya, and Joseph R. Coppola, each individually and on behalf of all others similarly situated, respectfully complain as follows against Defendants the Federal Bureau of Prisons ("BOP"), Thomas R. Kane, and David J. Ebbert.

## INTRODUCTION

1.     This class action lawsuit concerns the inadequate and unconstitutional treatment of prisoners within the Special Management Unit ("SMU") at the United

States Penitentiary at Lewisburg ("USP Lewisburg") who suffer from mental illness.

2.      The BOP houses men in the SMU at USP Lewisburg in tiny cells, frequently with another individual, for at least 23 hours a day.  International standards describe holding anyone in such conditions for more than two weeks as torture. Knowing that men are held in these conditions for years at a time, the BOP sends men with diagnosed mental illnesses to live in these conditions without adequate mental health treatment.  This lawsuit seeks to recognize that it is unconstitutional to hold men with mental illness is these conditions.  Plaintiffs seek declaratory and injunctive relief requiring the BOP to comply with its policies regarding the treatment of individuals with mental illness and to provide mental health diagnoses and treatment consistent with the requirements of the Eighth Amendment for individuals who have been committed to its custody.

3.      USP Lewisburg was built in 1932 and is a high security United States penitentiary located in Lewisburg, Pennsylvania.  It currently houses approximately 1,089 men, 437 of whom are held in a low security camp. The remaining 652 men are held in a high security facility, most of them in the SMU. A small number of individuals are held in a general population (non-SMU) unit in the high security facility at Lewisburg.  In 2009 the BOP transformed USP Lewisburg from a regular penitentiary to an SMU for the purpose of housing men

with unique security and management concerns.  Conditions of confinement in the

SMU are more restrictive than in a general population environment.  Men spend as

at least 23 hours per day in cells that are on average eight by eleven feet in size.

4.    Men who have been diagnosed with mental illness as well as with serious

mental illness[1]—including schizophrenia, bipolar disorder, and major depression—

are confined in these conditions, often sharing a cell with another man with mental

illness.

5.    The Eighth Amendment to the United States Constitution and BOP policies

require the provision of mental health treatment to those in the SMU at USP

Lewisburg who are suffering from mental illness.

6.    Specifically, formal BOP policies suggest a commitment to ensuring that

"inmates with mental illness are identified and receive treatment to assist their

progress toward recovery, while reducing or eliminating the frequency and severity

of symptoms and associated negative outcomes of mental illness."[2]

7.    The policies also demonstrate the BOP's recognition that extended

confinement in isolation combined with harsh disciplinary practices (such as

placement in four-points restraints) pose a substantial risk to individuals' mental

--------

[1] As defined *infra* at 51.
[2] BOP Program Statement 5310.16 on the Treatment and Care of Inmates with
Mental Illness (May 1, 2014).

health, especially for the men who had mental health problems before being confined in such conditions.

8.    Lastly, the BOP's policies state that SMU men may be transferred out of the SMU program if it becomes clear that their mental health status does not reasonably allow them to complete the SMU program.

9.    Despite these policies, the BOP houses dozens of men with serious mental illness in the SMU at USP Lewisburg and fails to provide adequate mental health care to individuals with mental illness, even denying individuals who have been diagnosed with mental illness by the BOP the treatment they require.  Together, the conditions of confinement at USP Lewisburg and the BOP's failure to properly diagnose and treat mental illness, have worsened the mental health status of men who arrive at USP Lewisburg with mental illness, and have caused other individuals to develop mental illness while at the facility.

10.    The less-than-constitutionally-adequate care provided for people with mental illness at USP Lewisburg consists of prison staff passing out coloring books and puzzles and calling it "treatment."  Most men never receive actual one-on-one counseling.  The supposed "counseling" they do receive is during psychology rounds and includes brief discussions with a psychology staff member through the cell doors.  Such conversations can be easily overheard by other men and are of are of limited utility as many do not wish to publicly air their mental health issues.

The psychology staff rarely do more than ask the men a very limited number of questions about their day.  If the men make any sort of response, they are considered mentally sound.  Psychology staff also make "observations" through the cell walls, and unless they observe extreme behavior, they make notes that the men have no mental health symptoms.  Prisoners' requests for one-on-one counseling and to see a psychiatrist are routinely ignored or denied.

11.    Men who arrive at USP Lewisburg already on medications for mental illness have had those treatments discontinued, sometimes as punishment.  Such treatment cut-offs can result in even more debilitating conditions and frequently lead to disciplinary issues for the men who need their prescribed medication to control their behavior.

12.    The impact of these conditions and the inadequate care is readily apparent at Lewisburg: men bang on the walls of their cells; they refuse to leave their cells for months, even for a shower; some men mutilate their bodies with whatever objects they can obtain; others carry on delusional conversations with voices they hear in their heads, oblivious to reality and to the danger that such behavior poses to themselves and to others; suicide attempts are common, and some attempts have been successful.  Inmate-on-inmate violence is not uncommon and has been fatal in some instances.

13.    Defendants' constitutional violations have repercussions beyond the harm caused to Plaintiffs and the class.  Many USP Lewisburg prisoners who suffer from untreated or poorly treated mental illnesses pose a constant threat to BOP personnel.  The extreme isolation and the lack of adequate mental health treatment only serve to increase the risk of assaults on prison staff.

14.    Although some men at USP Lewisburg will never be released from prison, many of them, including Plaintiffs, will eventually be released into the community when their sentences expire.  After years of confinement in isolation without proper treatment for mental illness, it will be extremely difficult for these men to safely and successfully reenter society.

15.    This lawsuit seeks to remedy the unconstitutional mental health system at USP Lewisburg by means of a permanent injunction, consistent with the requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, requiring the BOP to honor its own policies and the constitutional rights of individuals incarcerated at USP Lewisburg by removing those with serious mental illness from the SMU, preventing individuals with serious mental illness from being transferred to the SMU, and providing adequate mental health treatment for those men with mental illness who remain at USP Lewisburg.

## JURISDICTION

16.    This Court has subject matter jurisdiction over the allegations presented

herein pursuant to 28 U.S.C. § 1331, in that the claim for injunctive relief arise

under the United States Constitution and federal statutes, including 5 U.S.C. § 702

which waives sovereign immunity for an action seeking relief other than monetary

damages against an agency.  The request for declaratory relief is based upon 28

U.S.C. § 2201, in that an actual controversy exists between Defendants and each

Plaintiff over the denial of services that are guaranteed by the United States

Constitution.

## VENUE

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a

substantial part of the acts or omissions that give rise to Plaintiffs' claim occurred

or will occur in Union County, Pennsylvania, in the Middle District of

Pennsylvania.

## PARTIES

18.    Named Plaintiffs Jusamuel Rodriguez McCreary, Richard C. Anamanya, and

Joseph R. Coppola are currently housed at USP Lewisburg in the SMU.  Each

named Plaintiff has been diagnosed with a serious mental illness, including bipolar

disorder, major depression, and schizophrenia.  The care that each Plaintiff is

receiving at USP Lewisburg for his mental illness is constitutionally deficient and

otherwise fails to satisfy Defendants' legal obligations to Plaintiffs.  Specific facts relating to each Plaintiff are set forth below.

19.    Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice ("DOJ"), and is responsible for the administration of federal prisons, including USP Lewisburg.  The BOP maintains physical custody of Plaintiffs and class members.  The BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.

20.    Defendant Thomas R. Kane is the Director of the BOP.  He is sued herein in his official capacity.

21.    Defendant David J. Ebbert is the current warden at USP Lewisburg.  He is sued herein in his official capacity.

## GENERAL ALLEGATIONS

### Background and Operation of the USP Lewisburg
### Special Management Unit

22.    The BOP created the SMU program to house men determined to have unique security and management concerns.  Conditions of confinement for men in the SMU are more restrictive than for those in a general population environment in a high security penitentiary.

23.    The BOP established the SMU program on November 19, 2008, when it published Program Statement 5217.01.  In 2009, the BOP transformed USP

Lewisburg from a regular penitentiary to an SMU.  On August 9, 2016, the BOP published a new SMU policy, Program Statement 5712.02, which rescinded Program Statement 5712.01.

24.    According to the BOP policies, the SMU is a multi-level program whose mission is to teach self-discipline, pro-social values, and the ability to coexist with members of other cultural, geographical, and religious backgrounds.  SMU designation is supposed to be non-punitive.  The BOP can send any individual to the SMU that it has determined requires "greater management" and meets certain other criteria specified by the BOP.

25.    Specifically, any sentenced prisoner whose interaction with others requires greater management than for those in a general population environment may be designated to an SMU to ensure the safety, security, or orderly operation of BOP facilities, or the protection of the public, if the prisoner meets any of the following criteria:

   a.  The prisoner participated in or had a leadership role in disruptive geographical group- or gang-related activity;
   b.  The prisoner has a history of serious or disruptive disciplinary infractions;
   c.  The prisoner committed any "100-level" prohibited act, according to 28 C.F.R. pt. 541, after being classified as a member of a "Disruptive Group" pursuant to 28 C.F.R. pt. 524;
   d.  The prisoner participated in, organized, or facilitated any group misconduct that adversely affected the orderly operation of a correctional facility; and/or

e. The prisoner participated in or was associated with activity such that greater management of the inmate's interaction with other persons is necessary to ensure the safety, security, or orderly operation of BOP facilities or protection of the public.

26.    The SMU program has different levels that the men progress through until, ideally, they graduate from the program and can be moved to a general population or placed in another appropriate facility.

27.    In the SMU's original formulation, there were four levels and men were expected to take 18-24 months to complete the full program.  With the August 9, 2016 Program Statement 5712.02, the BOP shortened the length of the SMU program from four levels to three and specified a 12-month timeframe for completion.[3]

28.    Each of the levels also has an expected timeframe for completion: under Program Statement 5712.02, this is 6-8 months for Level 1, 2-3 months for Level 2, and 1-2 months for Level 3.  However, men can remain at any given level for significantly longer than the expected completion time if the BOP finds that they are not ready to progress to the next level.

29.    Additionally, men who receive disciplinary violations can be sent back to Level 1 where they must begin the program over again.  Under Program Statement

_____

[3] An August 17, 2016 memo from Lewisburg Warden David J. Ebbert clarified that men who had been in the SMU at USP Lewisburg for more than 24 months would not automatically be eligible for transfer and would be assessed on an individual basis.

5712.02, men can be cycled through the program for up to 24 months before being designated as "SMU FAIL" status.

30.    Under Program Statement 5712.01 there was no outer limit on the length of time men could remain in the SMU.  As a result, some men currently housed in the SMU have been there since the program's inception.

31.    The three levels also afford the men different privileges.  For the vast majority of the men in the SMU, their conditions of confinement are extremely restrictive.  Men at Levels 1 and 2 remain in their cells for 23 hours a day. Although the men are supposed to receive some access to telephones, all of the named plaintiffs have had their telephone privileges rescinded for years due to alleged disciplinary violations.  Many men report never receiving any telephone phone privileges and are cut off indefinitely from contact with family and friends.

32.    At each of the levels, the men must meet different milestones for progression.  An individual's progression through Level 1 is based upon his compliance with behavioral expectations.  Progression through Level 2 is based on the individual demonstrating potential for positive "community" interaction. Progression though Level 3 is based upon the individual's ability to demonstrate positive "community" interaction skills.  Individuals suffering from serious mental illness who are not properly treated find it very challenging, if not impossible, to

meet these milestones, and find themselves being cycled through the SMU

program multiple times and frequently ending as "SMU FAIL."

33.    All of the men in the SMU are allowed only a maximum of 5 hours of

recreation per week, and frequently get less or none.  The recreation time is spent

in cages that are approximately eight feet by twenty feet.  Sometimes men are

alone in the cage for recreation and other times there are as many as six individuals

in one cage.  Because individuals cannot choose whom they are placed in the cage

with, they are frequently in fear of others and many refuse recreation time for this

reason.

34.    Program Statement 5712.01 mentioned mental health care just once,

establishing the requirement that mental health staff evaluate men in the SMU

every 30 days.

35.    According to Program Statement 5712.01, men were also supposed to

receive a review of the their participation in and progression through the SMU

program ("SMU Review") within 28 days of their arrival at an SMU facility, and

every 90 days thereafter through the third level of the program.  Men in the fourth

level were slated to receive an SMU Reviews every 30 days.  The SMU Reviews

are not mental health reviews.

36.    Program Statement 5712.02 preserved the requirement for mental health

evaluations every 30 days and included a note that men requiring routine or follow-

up mental health services will receive them in accordance with other relevant BOP statements on mental health treatment (as described in paragraphs 67-74).

37.    In practice, most men in the SMU program never receive any mental health evaluations, let alone necessary follow-up mental health services.

## Extended Confinement in Isolation Can Have a Devastating Effect on Individuals' Mental Health

38.    Solitary confinement, known by many names, refers to the practice of holding an incarcerated person in a cell, alone or with a cellmate, between 22 and 24 hours per day, isolated from normal social interaction with others and subjected to severe restrictions impacting every aspect of their lives.

39.    The serious detrimental effects of long-term solitary confinement, especially for people with mental health problems, has been known by the BOP and mental health experts for decades.  As early as the 1960s, electroencephalography ("EEG") examinations demonstrated the slowing of brain waves of people confined in isolation for longer than a week.[4]

40.    A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions, and that after only a week

---

[4] Scott, G. D., & Gendreau, P. (1969). Psychiatric implications of sensory deprivation in a maximum security prison. *Canadian Psychiatric Association Journal*, 14, 337-341, https://www.ncbi.nlm.nih.gov/pubmed/5811243.

of solitary confinement, people showed decreased EEG activity, indicative of increased stress, anxiety, and depression.[5]

41.    As recently observed by the Chief Judge of the United States District Court for the Middle District of Pennsylvania, "Researchers have observed that 'psychological stressors such as isolation can be as clinically distressing as physical torture.'"[6]

42.    Expert, legal, and human rights organizations have recommended that because of the increased risk of serious harm to which individuals in solitary confinement are exposed, men suffering from mental illness should not be subjected to any form of prolonged placement in segregation.

43.    In its 2016 "Report and Recommendations Concerning the Use of Restrictive Housing," the Department of Justice ("DOJ") indicated that "inmates with serious mental illness ("SMI") should not be placed in restrictive housing." In the report, DOJ used the term "restrictive housing" to refer to solitary confinement.  DOJ further recommended that all inmates placed in restrictive

_____

[5] Gendreau, P., Freedman, N. L., Wilde, G. J. S., & Scott, G. D. (1972). Changes in EEG alpha frequency and evoked response latency during solitary confinement. *Journal of Abnormal Psychology*, 79, 54-59, https://www.unboundmedicine.com/medline/citation/5060981/Changes_in_EEG_alpha_frequency_and_evoked_response_latency_during_solitary_confinement_.
[6] *Johnson v. Wetzel*, 209 F. Supp. 3d, 766, 779 (M.D. Pa. 2016) (quoting Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. Psychiatry & Law 104, 104 (2010)).

housing should be screened for signs of mental illness and that prisons implement policies and systems to conduct repeated and varied reviews—including multiple times per day—to determine whether inmates in solitary confinement are showing signs of mental illness.

44.    The American Psychiatric Association has recommended that "prolonged segregation" of individuals with serious mental illness "with rare exceptions, should be avoided due to the potential for harm to such inmates."[7]

45.    The United Nations has long recognized solitary confinement as "torture or other cruel, inhuman or degrading treatment or punishment," most recently in the 2015 Mandela Rules.  Additionally, the World Health Organization identifies numerous and severe symptoms that result from even a brief period of solitary confinement.

46.    The BOP has known since at least 1999 that extended periods of confinement in isolation can be psychologically damaging to any prisoner and can be particularly harmful to individuals with pre-existing mental illness. Specifically, a 1999 study conducted under the auspices of the DOJ and the National Institute of Corrections concluded:

---------------------

[7] American Psychiatric Association, <u>Position Statement on Segregation of Prisoners with Mental Illness</u> (2012), http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf.

> Insofar as possible, mentally ill inmates should be excluded from extended control facilities. Each inmate being considered for such a facility should have a mental health evaluation. Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproductive, for this population.[8]

47.    In May 2013, the United States Government Accountability Office ("GAO") issued a detailed report entitled "Bureau of Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing."[9] That report includes many troubling findings concerning the BOP's operation of segregated housing including at USP Lewisburg. For example, GAO found a lack of documentation demonstrating that men received protections relating to conditions of confinement, such as receipt of meals and exercise as required. GAO also noted that the BOP has not assessed the extent to which segregated housing programs impact safety for incarcerated men and staff, or their long-term mental health.

48.    Additionally, GAO found:

> While most BOP officials told us there was little or no clear evidence of mental health impacts from long-term segregation, BOP's Psychology Services Manual explicitly acknowledges the potential mental health risks of inmates placed in long-term segregation. Specifically,

---

[8] https://s3.amazonaws.com/static.nicic.gov/Library/014937.pdf.
[9] http://www.gao.gov/assets/660/654349.pdf.

it states that BOP "recognizes that extended periods of confinement in Administrative Detention or Disciplinary Segregation Status may have an adverse effect on the overall mental status of some individuals.

49.    Following a June 2012 oversight hearing in the United States Senate about the impacts of solitary confinement, including double-cell solitary, on individuals' mental health, during which the Director of the BOP admitted that the BOP had never evaluated the impact of solitary confinement, the BOP commissioned an independent study on that and other issues.  The study culminated with a 242 page report issued in December 2014.[10]  Among many other BOP failings, that report detailed the following mismanagement of mental illness in restrictive housing facilities, including USP Lewisburg:

    a.   A large number of men in restrictive housing are receiving insufficient or inappropriate mental health treatment;

    b.   A large number of men in restrictive housing should not be assigned to such a facility due to their mental health conditions;

    c.   No protocol exists to identify men with mental illness who should be kept out of restrictive housing;

    d.   Individuals often receive a mental health diagnosis by medical students or interns who are not trained in psychiatry, and once diagnosed, they rarely receive follow-up reassessments or proper medication;

    e.   No reentry programs or means of tracking for individuals coming out of segregation exist.

Despite these findings, commissioned by the BOP, the deficiencies at USP Lewisburg continue unabated.

---

[10] https://www.bop.gov/resources/news/pdfs/CNA-SHUReportFinal_123014_2.pdf.

17

50.    Current BOP policies acknowledge the substantial risk to individuals'
mental health posed by extended confinement in isolation combined with these
harsh disciplinary practices such as four pointing, especially for the men who had
mental health problems before being confined in such conditions.  For example,
the Treatment and Care of Inmates with Mental Illness Program Statement states:
"The Bureau recognizes that an inmate's mental health may deteriorate during a
restrictive housing placement."

51.    Up until recently, most men in the SMU at USP Lewisburg were held in
double-cell solitary conditions due to overcrowding, meaning they shared the eight
by eleven foot cell with another man.  Some of the cells are so small that if one
man stands up, the other must sit on the bed.

52.    Evidence suggests that double-cell solitary confinement as practiced at USP
Lewisburg can be even worse than traditional single-cell solitary for mentally ill
individuals.  The frustration and anger that men experience from being placed in
restrictive housing conditions is intensified by having to deal with another person's
idiosyncrasies.  Confining two men in solitary conditions, especially if one or both
is mentally ill, creates a powder keg environment waiting to explode: cells are
more cramped, each man's movements are more restricted, and there is an acute
fear of the stranger in the cell.  These crowded conditions in already difficult
environments can deepen the paranoia and rage these men experience just by being

locked up.  The conditions can also worsen existing mental illnesses, forcing men who are locked together into a race to the bottom.[11]

53.    Men held in double-cell solitary conditions are stuck with the worst of both worlds.  Most of the men in the SMU as USP Lewisburg are locked in isolation for at least 23 hours per day, denying them human interaction and programming offered to others housed in a general population environment in a high security penitentiary while at the same time forcing them to share a space never intended to house two people.

54.    Double-cell solitary is particularly dangerous at the time when one man is being returned to his shared cell.  During those moments, one cellmate is cuffed while the other is not, providing the free-handed man an easy opportunity to take out his rage on his defenseless cellmate.  In 2010, two men at USP Lewisburg were killed in this exact situation, their hands in cuffs and their murderers unhinged.[12]

55.    The BOP has witnessed the devastating consequences of double-cell confinement at USP Lewisburg.  Since 2010, at least four men at USP Lewisburg

---

[11] https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html?utm_term=.d53f021e275e.

[12] http://www.dailyitem.com/news/group-per-cell-foments-prison-s-violence/article_e10b01bf-b8ae-5d18-b536-292caaeac68c.html.

have been killed by their cell mate.  As one inmate described it "A single cell would be cheaper than what they've spent in hospital bills and funerals."[13]

56.    Despite the foregoing and substantial anecdotal and empirical data confirming the detrimental impact on mental health of extended isolated confinement, the BOP still assigns men to USP Lewisburg who have mental illness, including men with serious mental illness, and denies them even minimally appropriate mental health care.

### The BOP Violates the Constitution and Fails to Adhere to Its Own Policies Regarding the Evaluation and Treatment of the Mentally Ill

*Inadequate Screening for Mental Illness*

57.    The BOP's written procedures for transferring individuals to SMUs, including USP Lewisburg, state that "inmates referred for extended placement in restrictive housing (i.e., SMU) must be reviewed by Psychology Services staff to determine if mental health issues exist that preclude placement in this setting."[14]

58.    BOP policies also require intake screening for all men entering a BOP institution.  With regard to this general initial and transfer intake screening, BOP policy requires a Health Services screening within 24 hours of arrival at a facility. BOP instructs Health Services staff to "interview[] and observe [prisoners] for

---

[13] *Id.*

[14] BOP Program Statement 5310.16, "Treatment and Care of Inmates with Mental Illness," p. 16.

indicators of mental illness."  If staff members observe any mental health concerns,

they must refer the person to Psychology Services for prompt evaluation by a

psychologist.[15]

59.    For men assigned to restrictive housing, BOP policy mandates an "initial

psychological review … on or before the 30th calendar day of consecutive

confinement in restrictive housing."[16]

60.    Despite these policies, the BOP routinely places men suffering from serious

mental illness in the SMU at USP Lewisburg, ignoring previous diagnoses of

serious mental illness and failing to conduct the required psychological screenings.

61.    Incoming prisoners do not receive the psychological evaluations required by

the policies.  Instead, upon arrival to USP Lewisburg, the men receive a brief

intake evaluation, lasting approximately ten minutes, with a member of USP

Lewisburg's general medical staff who does not specialize in psychology or

psychiatry and who does not administer an evaluation that conforms with

contemporary community standards used by mental health professionals to

evaluate and diagnose patients with mental illnesses.  These perfunctory interviews

are wholly inadequate as a form of diagnosis of mental illness or screening for

suitability for confinement at an SMU facility.

------------------------

[15] BOP Program Statement P5310.17 (Aug. 25, 2016), "Psychology Services
Manual," p. 14.
[16] *Id.* at 17.

*Insufficient Mental Health Staffing at USP Lewisburg*

62.     According to BOP policies, all BOP institutions, regardless of custody level, are expected to provide services for men with mental illness, and Psychology Services and Health Services departments are supposed to ensure every individual with a clinically identified need for psychological treatment has access to mental health care.

63.     The mental health staffing at USP Lewisburg is not adequate to meet the expectations set forth in the BOP policies.  At the time this action was filed, there were only five (or fewer) psychologists on staff as USP Lewisburg, and they were responsible for the mental health of all of the approximately 1089 men at USP Lewisburg.  Men experiencing mental health emergencies (e.g., suicidal thoughts, psychosis) are directed to inform any USP Lewisburg staff member that they need to speak with psychology staff.  However, the men report rarely, if ever, having the opportunity to speak in private with a staff psychologist.

64.     For non-emergencies, the men are directed to speak with a psychologist during daily medical rounds or to send the unit psychologist a cop-out (a prisoner request to staff member).

65.     There is no psychiatrist on staff at USP Lewisburg.  In the event of complex mental health and psychiatric medication needs, USP Lewisburg is supposed to rely on the "Tele-health program" (also commonly called "tele-psych")—which

utilizes an audiovisual interface to connect men at USP Lewisburg with a consulting psychiatrist located at the United States Medical Center for Federal Prisoners ("USMCFP") in Springfield, Missouri.  However, Plaintiffs report never being offered the opportunity to speak with a psychiatrist via the tele-pysch.

66.    Many men at USP Lewisburg have chronic mental illnesses, and many others experience periodic acute mental health crises, and a substantial number require psychotropic medication.  These men require significant psychiatric care which they are not receiving because there is no psychiatrist staffed at USP Lewisburg and little to no use of the tele-psych program.

*Lack of Adequate Mental Health Treatment*

67.    On paper, the BOP's policies show a commitment to adequate mental health treatment.  In its January 15, 2005 Program Statement P6340.04 on Psychiatric Services ("Psychiatric Services Program Statement"), the BOP outlined its commitment and approach to providing "essential, cost-effective, high-quality, and humane diagnostic and treatment services throughout … inmates' incarceration."

68.    Similarly, the stated purpose of the BOP's May 1, 2014 Program Statement 5310.16 on the Treatment and Care of Inmates with Mental Illness ("Mental Illness Program Statement") is "to ensure that inmates with mental illness are identified and receive treatment to assist their progress toward recovery, while reducing or

eliminating the frequency and severity of symptoms and associated negative outcomes of mental illness."

69.    The BOP's Mental Illness Program Statement details the mental health care levels recognized by the BOP: (1) CARE1-MH-no significant mental health care; (2) CARE2-MH-routine outpatient mental health care or crisis-oriented mental health care; (3) CARE3-MH-enhanced outpatient mental health care or residential mental health care; and (4) CARE4-MH-inpatient psychiatric care.  Care levels two through four evidence the BOP's acknowledgement of the need for outpatient, residential, and inpatient psychiatric care tailored to the needs of individual men.

70.    For care levels two through four, the Mental Illness Program Statement requires the BOP to offer "collaborative, individualized treatment plan[s]" for men, as well as "[e]vidence-based psychosocial interventions," none of which occurs at USP Lewisburg.

71.    For men with mental illness in restrictive housing such as the SMU program, the BOP's Mental Illness Program Statement requires "at a minimum, face-to-face mental health contacts consistent with the type and frequency indicated by the [individual's] care level, to the extent feasible.  These contacts take place in a manner that protects an inmate's privacy…[,]" including removal of SMU men from their cells for private or extended interviews.  Private face-to-face mental health contacts do not occur at USP Lewisburg.

24

72.    The BOP also requires psychology staff to review the psychological status of SMU men every thirty days, as detailed in its August 25, 2016 BOP Program Statement P5310.17 Psychology Services Manual.  These reviews must contain clinically relevant observations and findings relating to mental health for men assigned care level CARE2-MH or above.  Men at USP Lewisburg report that these reviews do not occur.

73.    All institutions are required to provide psychiatry services, which the BOP details in its Psychiatric Services Program Statement.  These required services include "[r]isk assessment for acts of self-harm or harm towards others"; "[m]ental health screening of inmates suffering from symptoms or behavioral disturbances indicative of possible mental illnesses or disorders"; "[d]iagnosis and treatment of mild to moderate mental illnesses such as non-psychotic major depression, anxiety disorders, or sleep disorders"; "[c]ontinuation of psychiatric treatment initiated at other institutions or prior to incarceration"; and "[m]onitoring of inmates on psychiatric medications for side-effects and drug interactions" among other services.

74.    SMU Program Statement 5712.02 includes additional mention of treatment of mental illness that was not in the original SMU Program Statement 5712.01, including stating that "mental health care is always available either at the institution or from the community.  In addition, men with an identified need for

routine and/or follow-up mental health services will receive these services in accordance with the Program Statements."

75.    However, despite these seemingly expansive policies concerning the development of treatment plans and delivery of mental health services, the BOP has failed to develop meaningful treatment plans for prisoners at USP Lewisburg who have chronic and obvious mental illness, and has failed to establish a reliable mechanism for delivering elementary mental health services, such as access to psychiatry services, mental health medication, timely access to crisis counseling, and counseling in both individual and group settings that is delivered in a consistent fashion.

76.    For the first few years that USP Lewisburg operated as a SMU, men were prescribed mental health medication and some individuals were given access to the tele-psych.  These practices stopped in approximately 2013 or 2014 without explanation, and the problems described above regarding inadequate mental health treatment have continued including after the implementation of the August 2016 SMU Policy Statement.

77.    USP Lewisburg staff routinely ignore BOP policies in classifying the mental health care levels of men in the SMU.  For example, men who have been on suicide watch multiple times are classified at CARE1-MH.  These CARE classifications have a significant impact on the mental health services men receive.

78.    Men designated at CARE1-MH are never removed from their cells for private counseling sessions.  Instead, the only "counseling" sessions are conducted by Psychology Staff, through the cell door, in the immediate presence of a correctional officer and an individual's cellmate, and within earshot of other men housed nearby.

79.    The men complain that they often cannot even hear the person on the other side of the cell door due to the noise from the fans and other individuals (and in G-block—where men with mental illness are frequently placed—there is a flap over the door which adds an additional layer of isolation).  Further, few people, in or out of prison, are comfortable discussing intensely personal matters in a highly public environment that renders them subject tos ridicule, discrimination, and other violent repercussions for their attempts to get help.  As a result, men at USP Lewisburg are forced by the facility's approach to mental health "counseling" to choose between forgoing that inadequate counseling or exposing themselves to violent assault.

80.    Further some men choose not to respond to questioning from USP Lewisburg staff regarding their mental health for fear that, if they do respond, Psychology staff will consider that response sufficient to conclude they have no mental health issues.

81.    Men classified as CARE2-MH are pulled from their cells for "counseling" sessions.  But these are short, five to ten minute, conversations in the shower with Psychology staff that are neither meaningful nor helpful in addressing the serious mental health needs of these men.

82.    Psychology staff at USP Lewisburg also deny men their previously prescribed mental health medication.  Men who were previously diagnosed with mental illness by the BOP and prescribed medication at other BOP facilities are routinely taken off their medication when they arrive at USP Lewisburg.

83.    Men have attempted to submit cop-outs, medical requests, and grievances to gain access to more meaningful mental health treatment but their requests are denied.

84.    Instead, Psychology Services staff pass games and puzzles to men as "treatment" for serious mental illness that could be so severe as to include manic and/or depressive episodes.

85.    Men suffering from mental illness at USP Lewisburg are subject to harsh disciplinary practices such as "four-pointing" for incidents resulting from their untreated illness, including attempts at suicide.  Four-pointing involves chaining men by the wrists and ankles in either a prone or supine position on top of a concrete platform for several hours and often for many days.  Correctional officers place men at USP Lewisburg in paper clothes before four-pointing them, no matter

how cold the temperature in the prison.  While chained, men with mental illness may be left to urinate and defecate on themselves, and sometimes are denied basic nutrition.  The restraints often leave the men with nerve damage that lasts several months.  The practice can heighten already severe symptoms of mental illness as men suffering from these conditions often live on the edge of their emotional endurance, and being chained in four-point restraints can further torture them.

86.    In November 2015, the District of Columbia Corrections Information Council ("CIC")[17] released a report detailing the CIC's inspection of USP Lewisburg and investigation into, among other things, mental health treatment at USP Lewisburg.  The CIC found that the Psychology Services staff at USP Lewisburg was unresponsive to individuals' "'mental health needs.'"  In the CIC's study, numerous men reported being taken off necessary mental health medication; many others reported that their requests to be seen by Psychology Services had gone unanswered.

---

[17] The CIC is an independent monitoring agency established by the Revitalization Act of 1997.  The mission of the CIC is to inspect, monitor, and report on the conditions of confinement at facilities where D.C. residents are incarcerated, including BOP facilities.  The CIC reports its findings and recommendations to several officials and governmental bodies including the Director of the BOP.  The agency also releases reports on inspected facilities and issues an annual report regarding general issues affecting conditions of confinement for incarcerated DC residents.

87.    The CIC also reported that while men can submit cop-outs to request individual counseling, due to limited resources and understaffing, Psychology Services cannot accommodate all requests for confidential individual counseling sessions.  This lack of adequate Psychology Services staff is particularly concerning with men in restrictive housing and isolated confinement, which is a population with increased mental health needs.

*Continued Housing of Mentally Ill Individuals at USP Lewisburg*

88.    The BOP's August 9, 2016 Program Statement on Special Management Units states that an individual may be removed from the SMU program if it becomes clear that his mental health does not reasonably allow him to complete the program.

89.    However, men with mental illness and serious mental illness held at USP Lewisburg, such as Plaintiffs and other members of the class, are sometimes confined in the SMU at USP Lewisburg for months or years without adequate mental health treatment, with predictably devastating results.  These conditions exacerbate their mental illness, making them increasingly dangerous to themselves and others.

90.    Many men suffering from serious mental illness are unable to complete the SMU program.  However, even classification as SMU-FAIL does not guarantee men suffering from mental illness that they will be moved from the SMU at

Lewisburg.  Plaintiff Jusamuel McCreary was classified as SMU-FAIL in June of

2016 and has been designated to the STAGES program at USP Florence; however,

he continues to be housed in the SMU program at USP Lewisburg.

**Defendants Have Displayed Sustained Deliberate Indifference to the Plight and Needs of Prisoners with Mental Illness at USP Lewisburg**

91.    Defendants are, and have been for years, on actual notice of Plaintiffs'

other class members' unmet mental health needs at USP Lewisburg, but have

demonstrated sustained and deliberate indifference to those needs.

92.    Defendants' actual knowledge of the unmet mental health needs of men at

USP Lewisburg has come from a variety of sources, including medical records of

Plaintiffs and other class members, direct observation of Plaintiffs and other class

members with obvious mental illness, evidence provided by other men at USP

Lewisburg in the course of prior litigation challenging the USP Lewisburg mental

health system, and suicides and attempted suicides by men with mental illness.

93.    BOP employees have witnessed clear manifestations of mental illness,

including men smearing feces, repeatedly banging their heads against their cell

walls, talking to themselves, and experiencing delusional episodes.

94.    As discussed in detail above, multiple reports have detailed the failings of

USP Lewisburg in treating mental illness, including the November 2015 CIC

report, the May 2013 GAO report, and the December 2014 report commissioned

by the BOP following the 2012 Congressional oversight hearing.

31

95.    Since 2013, there have been at least six lawsuits filed against various officials as USP Lewisburg alleging in whole or in part constitutionally inadequate treatment for mental illness.[18]

96.    In 2013, former USP Lewisburg prisoner Scott Njos sued the BOP and staff at USP Lewisburg for Eighth Amendment violations, alleging that the defendants denied him treatment for his long-standing mental illness, including manic episodes and PTSD from prior physical and mental abuse.  Upon information and belief, Njos suffers from mental illness, and the defendants denied him individual therapy sessions (the only "therapy" he received was cell-side discussions as described above) and medications prescribed by a doctor at a prior prison.[19]

97.    Similarly, former USP Lewisburg prisoner, Joseph Mitchell filed a suit against the United States, the BOP, and various USP Lewisburg officials for failure to provide him with adequate mental health treatment.  Mr. Mitchell had been diagnosed with atypical mood disorder, atypical depressive disorder, borderline personality disorder, and bipolar disorder, and had been prescribed buproprion at a prison prior to being transferred to USP Lewisburg.  When he arrived at USP Lewisburg his medication was stopped.  Mr. Mitchell attempted suicide more than

------

[18] *See, e.g., Thompson v. United States*, No. 1:13–cv–1867 (M.D. Pa. filed July 9, 2013); *Huffman v. United States*, No. 3:14–cv–0595 (M.D. Pa. filed March 31, 2014); *Milhouse v. Sage*, No. 1:14–cv–1055 (M.D. Pa. filed June 2, 2014); *Parks v. Edinger*, 1:13-cv-01834 (M.D. Pa. filed July 10, 2013).
[19] *Njos v. Bureau of Prisons*, No. 3:12–cv–1251 (M.D. Pa. filed June 29, 2012).

once while incarcerated at USP Lewisburg.[20]  That case was dismissed for failure to exhaust administrative remedies but further documents the defendants' knowledge.

98.    Despite being on notice of the concerns of men suffering from mental illness as USP Lewisburg, the BOP has failed to address the problems showing a deliberate indifference to the needs of these men.

### ALLEGATIONS RELATING SPECIFICALLY TO NAMED PLAINTIFFS

99.    The named Plaintiffs are currently incarcerated at USP Lewisburg and each has a serious mental illness.  The named Plaintiffs were all incarcerated at USP Lewisburg prior to August 2016; however, they have continued to receive constitutionally inadequate mental health treatment since the implementation of Program Statement 5712.02.

100.   Defendants' failure to implement adequate programs of mental health screening and treatment has subjected them to cruel and unusual punishment, exacerbated their mental illnesses, and subjected them to harm and injury, as well as serious risk of future harm.

---

[20] *Mitchell v. Sage*, No. 3:14cv905, 2014 WL 5493193 (M.D. Pa. Oct. 30, 2014) (adopting Report and Recommendation, *Mitchell v. Sage*, No. 3:14cv905, 2014 WL 5493193 (M.D. Pa. July 21, 2014)).

**Jusamuel Rodriguez McCreary**

101.    Jusamuel Rodriguez McCreary, BOP Register Number 20958-058, is currently incarcerated at USP Lewisburg.  Mr. McCreary is scheduled for release on October 21, 2027.

102.    Mr. McCreary suffers from serious mental illness.  He has been diagnosed with bipolar disorder and schizophrenia both prior and during incarceration.  The BOP has diagnosed him with depression, mood disorder, psycho-social and environmental problems, ADHD, and antisocial personality disorder.

103.    Mr. McCreary grew up in Charlotte, North Carolina.  As a young child, Mr. McCreary was a product of parental neglect and lacked familial support.  In 1994, the Department of Social Services assumed temporal control of him and his siblings.  Later, when he was about ten years old, Mr. McCreary attempted suicide by hanging in his bedroom closet.  Upon information and belief, Mr. McCreary's mother sought treatment for her son at New Hope Treatment Center in South Carolina where he was diagnosed with bipolar disorder and schizophrenia and was prescribed medication.

104.    Mr. McCreary received frequent mental health treatment between the time of his initial diagnosis and his current incarceration.  Upon information and belief, in or about 1999, Mr. McCreary was treated at an outpatient facility in South Carolina.  Subsequently, Mr. McCreary was treated at The Pines Residential

Treatment Center in Portsmouth, Virginia and at Cumberland Hall Psychiatric Hospital in Chattanooga, Tennessee.

105.   Prior to sentencing on the charges for which Mr. McCreary is currently incarcerated, Mr. McCreary was examined by Dr. H.D. Kirkpatrick, Ph.D., ABPP. Dr. Kirkpatrick determined that Mr. McCreary suffered from "a history of mental health issues," including past diagnoses of schizophrenia, Tourett's Syndrome, and R/O pervasive developmental disorder.  Further, Dr. Kirkpatrick diagnosed Mr. McCreary with depressive disorder, ADHD, antisocial personality disorder, and conduct disorder.  Dr. Kirkpatrick determined that "placement in a prison environment would only aggravate" Mr. McCreary's mental health issues.

106.   Also prior to sentencing, the United States filed "Government's Response To Defendant's Objections To The Pre-Sentence Report And Motion For A Variance" in response to Mr. McCreary's sentencing objections and request for variance due to his mental illness.  In the same paragraph that the government argued Mr. McCreary should be denied any such variance, the government mentioned that "the defendant clearly has a significant history of mental illness" and "a history of mental instability."

107.   As part of Mr. McCreary's sentence, Chief Judge Conrad of the Western District of North Carolina imposed the following special conditions upon Mr. McCreary: (1) "The defendant shall participate in a program of mental health

testing and/or treatment under the guidance and supervision of the U.S. Probation

Office" and (2) "The defendant shall remain in treatment and maintain use of any

prescribed medications until satisfactorily discharged by the program and with the

approval of the U.S. Probation Office."

108.   Between 2008 and 2010, Mr. McCreary was incarcerated at three different

BOP facilities.  At all of these facilities, he received regular psychological

treatment, including out-of-cell counseling and tele-psych access, and was

prescribed mental health medication.

109.   In or about October 2010, the BOP transferred Mr. McCreary to USP

Lewisburg.  Initially, the BOP treated Mr. McCreary's mental health issues with

prescriptions of Depakote[21] and Remeron[22].  However, in or around late 2011 or

early 2012, the BOP changed his medication to the injectable form of Risperdal,

which is a drug commonly prescribed to treat schizophrenia and bipolar disorder.

Mr. McCreary was afraid of the injection and refused the medication.  The BOP

did not offer Mr. McCreary the oral form of Risperdal or any alternative

medication for his mental health issues.  Rather, Dr. Pigos suddenly withheld all

mental health medication from Mr. McCreary.  Subsequently, but while still

incarcerated at USP Lewisburg, Dr. Andrew Edinger—a family practice and

---

[21] Depakote (valproic acid) is an anticonvulsant medication used to treat mania in
people with bipolar disorder.
[22] Remeron (mirtazapine) is an antidepressant medication.

general medicine doctor—restored Mr. McCreary's access to mental health medication.

110.   In or about May 2013, the BOP transferred Mr. McCreary to USP Florence where they provided him regular access to tele-psych treatment and prescribed him medication.

111.   In or about March 2014, the BOP transferred Mr. McCreary back to USP Lewisburg.  At the time, Mr. McCreary was taking BOP-prescribed Celexa.[23] During an intake interview, Mr. McCreary told Dr. Edinger that he had attempted suicide at USP Florence by cutting his wrists, was experiencing frequent suicidal thoughts, and was hearing voices.

112.   In July 2014, Dr. Edinger ended Mr. McCreary's Celexa prescription and denied him all other mental health medication.  Despite prior diagnoses of—and prescription medication to treat—serious mental illness, both within and before entering the prison system, Mr. McCreary has received no mental health medication since returning to USP Lewisburg in 2014.

113.   The mental health "treatment" Mr. McCreary has received consists of inadequate, cell-side conversations through the cell door and in full view of other men.  As with the other Plaintiffs, such informal and cursory conversations cannot sufficiently address Mr. McCreary's mental illness.  Further, such public

---

[23] Celexa (citalopram) is a SSRI antidepressant medication.

conversations pose a serious physical threat to Mr. McCreary's health, because, if other men learn the details of Mr. McCreary's mental health problems, they are likely to assault and/or harass him either because his serious mental illness is socially unacceptable or because they fear him due to his serious mental illness.

114.   Up until May 2017, Dr. Jennifer Enigk—an SMU psychologist at USP Lewisburg—would pull Mr. McCreary out of his cell for a five minute conversation in the prison showers, where she asked if he wanted a "packet" containing crossword puzzles and colorable cartoons.  (Examples of these materials are attached at Exhibit A.)  Mr. McCreary has made numerous requests for more substantive private therapy sessions, but all have been denied.

115.   Since his return to USP Lewisburg in 2014, Mr. McCreary has not had access to the tele-psych despite numerous requests to see one.

116.   In June 2016, the BOP Central Office determined that Mr. McCreary's mental illness was too severe to send him to the Administrative Maximum Facility ("ADX") at USP Florence and designated him to the STAGES program at USP Florence which is intended for inmates suffering from mental illness, specifically those with personality disorders and a history of self-injurious behavior.  Despite this, the BOP continues to house Mr. McCreary at USP Lewisburg and refuses to prescribe him any medication.

117.   In March 2017, Mr. McCreary attempted suicide by overdosing on Tylenol. He had to have his stomach pumped, and was then put in four-points restraints for three hours followed by eleven hours in ambulatory restraints.

118.   In May 2017, Mr. McCreary attempted suicide by hanging himself and was placed on suicide watch for five days.  He is now in an "ADX cell," a term used to describe a cell which has two doors at its entrance, one of which is a solid steel door and the other a grated door, and one cannot exit or enter the cell without the first door being fully closed and locked.  He is in complete isolation where he cannot be heard by anyone as his ADX cell is removed from all other prisoners.

119.   Mr. McCreary is receiving weekly "therapy" which consists of a brief (approximately two-minute) conversation behind the door during which he must yell to be heard.

120.   On May 8, 2017, Mr. McCreary was upgraded to CARE3-MH, but was recently told by Dr. Edinger that he does not "need" medication.  He has not been out of his cell since May 16, 2017.

121.   In addition to numerous failed in-person requests for proper mental health treatment, Mr. McCreary has sought administrative relief regarding his mental health treatment at USP Lewisburg, and all efforts have been rejected.  In his various grievance filings, Mr. McCreary has expressed fear for his safety due to his untreated suicidal thoughts.

### Richard C. Anamanya

122.   Richard C. Anamanya, BOP Register Number 37750-007, is currently incarcerated at USP Lewisburg.  Mr. Anamanya is scheduled for release on November 18, 2037.

123.   Over the past twenty years, Mr. Anamanya has received multiple diagnoses of mental illness and other mental health concerns, both inside and outside the correctional system.  In connection with these diagnoses, Mr. Anamanya has been prescribed several psychotropic medications to treat his mental illness.

124.   In or around November 1998, when he was 15 years old, Mr. Anamanya was seen at the Progressive Life Center of Prince George's County, Maryland, where he was diagnosed with major depressive disorder, psycho-social and environmental stressors, and chronic depression, and was prescribed medication.

125.   In or around February 1999, when he was 17 years old, Mr. Anamanya was admitted to the Psychiatric Institute of Washington ("PIW") in Washington, DC, because he was aggressive, talking to himself, and unable to recognize family members.  While at PIW, Mr. Anamanya was prescribed psychotropic medications.

126.   In September 2005, Mr. Anamanya was admitted to Saint Elizabeth's Hospital in Washington, D.C. ("St. Elizabeth's") for an assessment of his competency to stand trial.  St. Elizabeth's is Washington, D.C.'s public psychiatric

facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. St. Elizabeth's also provides mental health evaluations and care to patients committed by D.C. courts.

127.   The psychologist who conducted the court-ordered Forensic Psychological Assessment (i.e., a mental health evaluation) diagnosed Mr. Anamanya with clinical depression, mood disorder, cannabis abuse, alcohol abuse, antisocial personality disorder, and seizure disorder. He was prescribed Depakene,[24] Cogentin,[25] and Risperdal.[26]

128.   In January 2006, Mr. Anamanya's criminal defense attorney requested a second competency to stand trial evaluation. The psychologist who conducted the evaluation found that Mr. Anamanya was suffering from "considerable auditory hallucinations and delusional thinking." He further stated that "it appears a much more appropriate Axis I diagnosis . . . would be one that takes into account his psychotic condition" and concluded that "it is most likely that his diagnosis is one of Shizoaffective Disorder." The psychologist also concluded that Mr. Anamanya

_____

[24] As relevant here, Depakene (valproic acid) is an anticonvulsant medication used to treat mania in people with bipolar disorder.

[25] Cogentin (benztropine mesylate oral) is primarily used to treat symptoms of Parkinson's disease and tremors caused by other medical conditions or drug use. Cogentin is sometimes prescribed for other uses.

[26] Risperdal (risperidone) is an atypical antipsychotic medication used to treat symptoms of schizophrenia, episodes of mania in people with bipolar disorder.

would benefit from a "continued regimen of anti-psychotic and mood stabilizing agents."

129.  Mr. Anamanya was incarcerated at USP Atlanta from approximately July 2006 to January 2007.  While incarcerated at USP Atlanta, Mr. Anamanya was diagnosed with mood disorder and antisocial personality disorder.  Mr. Anamanya did not receive therapy, but he was prescribed medication.

130.  From approximately May 12, 2009 to 2011, Mr. Anamanya was incarcerated at USP Lewisburg for the first time.  For a portion of this period, Mr. Anamanya received individual counseling twice per week and was prescribed Depakene and Risperdal.

131.  Between the end of 2011 and 2015, Mr. Anamanya was housed at four different BOP facilities.  At various facilities, he was diagnosed with antisocial personality disorder, adjustment disorder, depressive disorder, and anxiety disorder.  At all of the facilities he was prescribed mental health medication including Haldol,[27] Prozac, Zoloft,[28] and Buspar.[29]

--------

[27] As relevant here, Haldol (haloperidol) is a conventional antipsychotic medication used to treat psychotic disorders.

[28] As relevant here, Zoloft (sertraline) is a selective serotonin reuptake inhibitor (SSRI) medication that is also used to treat obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.

[29] Buspar (buspirone) is a medication used to treat anxiety disorders or symptoms of anxiety.

132.   While incarcerated at USP Big Sandy, Mr. Anamanya also received a

suicide risk assessment, a behavior management plan, and individual therapy and

counseling.

133.   On or around August 10, 2015, Mr. Anamanya was transferred to USP

Lewisburg.  Upon arrival, Mr. Anamanya did not receive a mental health

evaluation, and has not received adequate mental health care.

134.   Upon arrival at USP Lewisburg, Mr. Anamanya received an evaluation from

Dr. Edinger who is not a psychologist.  Dr. Edinger noted Mr. Anamanya's history

of depression, and assessed Mr. Anamanya to have adjustment disorders with

mixed disturbance of emotions and conduct, unspecified depressive disorder,

antisocial personality disorder, and additional psychosocial and environmental

problems.  Dr. Edinger noted that Mr. Anamanya had been prescribed Zoloft and

Buspar prior to his arrival at USP Lewisburg.

135.   On or around September 11, 2015, Dr. Edinger discontinued Mr.

Anamanya's mental health medication with no explanation other than that he no

longer needed it.

136.   On or around September 26, 2015, following Mr. Anamanya's grievance on

the issue, Dr. Edinger re-prescribed mental health medication.  At various points he

was prescribed Zoloft and Citalopram.

137.   On or around December 9, 2015, Mr. Anamanya's medication was

discontinued.  According to the BOP, this was the result of Mr. Anamanya not

taking his medication during "pill line," which is when medical staff make rounds

to each cell block to distribute medication.  Mr. Anamanya exhausted his

grievances on this issue but has received no recourse.  He has not received

medication since December 2015.

138.   Since being incarcerated at USP Lewisburg, Mr. Anamanya has not received

adequate therapy or counseling for his mental health issues.  On several occasions,

Mr. Anamanya has asked to speak with members of the USP Lewisburg

Psychology Services department about his mental health and suicidal thoughts, and

all of these requests have been ignored or disregarded.

139.   The only mental health "treatment" Mr. Anamanya has received are the

inadequate, cell-side conversations through the cell door and in full view of other

men, and the receipt of "packets" containing crossword puzzles and colorable

cartoons.  (Examples of these materials are attached at Exhibit A).

140.   Mr. Anamanya has never seen the tele-psych despite numerous requests to

do so.  Mr. Anamanya has attempted to take his life three times since arriving at

USP Lewisburg, and he has had several suicide risk assessments, but he has never

been placed on suicide watch.  He has also repeatedly been placed into four-point

restraints for expressing his suicidal thoughts and for behavioral issues related to his untreated mental illness.

141.   In or around February 2017, Mr. Anamanya received an 18-month SMU evaluation.  It did not involve a mental health evaluation.

142.   As recently as March 2017, Mr. Anamanya asked for treatment because he recently began hearing voices and is still having suicidal thoughts, yet he has received no mental health treatment.

143.   Mr. Anamanya has sought administrative relief regarding a number of issues, including requests for a psychological evaluation, for his mental health care level to be upgraded, and for an individual treatment plan.

144.   Mr. Anamanya's efforts have all been rejected, and he has been told to submit another "cop-out" or speak to psychologists during rounds.

### Joseph R. Coppola

145.   Joseph R. Coppola, BOP Register Number 33874-048, is currently incarcerated at USP Lewisburg.  Mr. Coppola is scheduled for release on January 26, 2018.

146.   Throughout childhood, Mr. Coppola bounced around numerous group homes and shelters and received mental health treatment at various institutional facilities.  His last visit to a mental health facility prior to his incarceration was in 1990 when he was 18 years old and serving in the U.S. Navy.  At that time, Mr.

Coppola was seen at the Naval Medical Center ("NMC") San Diego (informally referred to as "Balboa Hospital"), where he was diagnosed with bipolar disorder and prescribed mental health medication.

147.   Mr. Coppola had been referred for evaluation at the NMC after "behaving in a bizarre manner," including taking off all his clothes except for his shorts and washing his clothes in the barrack courtyard, at times looking around suspiciously, crawling under the wash rack and splashing water on himself.  While be treated at the NMC Emergency Room, he was uncooperative, belligerent, and eventually required four point restraints when he tried to escape in response to a request that the side rails be raised on the gurney.

148.   Mr. Coppola was subsequently discharged from the U.S. Navy as "unfit for further duty" due to his mental illness.

149.   During a previous incarceration, while housed at the Federal Transfer Center in Oklahoma City, Mr. Coppola received a Brief Counseling Session from a psychologist who noted that Mr. Coppola was "a mental health transfer case" and that his file materials "indicate[d] a history of schizophrenia and anxiety."

150.   Additionally, Mr. Coppola's Evaluation Upon Arrival to FCI Terminal Island in 2001 mentions that "his records indicated a history of depression as well as bipolar disorder.

151.   In the case resulting in Mr. Coppola's current incarceration, the United

States moved for a hearing to determine the mental competency of the defendant

and psychiatric evaluation arguing that Mr. Coppola had made several statements

that were "non-responsive" and that "called into question his competency."

152.   Mr. Coppola's sentencing memorandum also discusses his mental health,

explaining that his "behavior closely fits a pattern of continuing mental health

problems that may have not been adequately addressed through treatment

including pharmacological intervention."

153.   From 2005 through 2013, Mr. Coppola was incarcerated in ten different

BOP facilities.  He was transferred several times for episodes relating to his mental

health disorder.  During his incarceration at USP Hazelton, Mr. Coppola received a

Medication Review.  The psychologist who conducted that review noted that Mr.

Coppola had an "[o]ld dx of bi-polar that may be incorrect, but he is similar to

BiPolar II."

154.   On January 2, 2013, Mr. Coppola submitted an "Official Notice of Serious

Mental Disorder" to the Disciplinary Hearing Officer at FCI Phoenix.  In the

Notice, Mr. Coppola informed the hearing officer of his bipolar disorder diagnosis

and his history of taking medication for his mental health.  Mr. Coppola also

highlighted paragraphs 13 and 23 of his Pre-sentence Report, which also identify

his bipolar disorder.  Mr. Coppola appended to the Notice a "Response Summary"

from a psychology page of a "Program Review" on which Mr. Coppola's "history of mental health diagnosis prior to incarceration," including "depression, bipolar … history of taking Lithium[30] and Thorazine[31]" are clearly documented.

155.   While Mr. Coppola has been incarcerated, he has made over 80 requests, including 25 at USP Lewisburg, for treatment of his bipolar disorder.  Every one of these requests has been refused or ignored.  According to Mr. Coppola, this lack of treatment during his incarceration—especially when it was for 24 hours-a-day, seven days-a-week in a SHU setting—has triggered extreme mood swings, worsening his bipolar disorder and resulted in his loss of over two years of good time.

156.   Mr. Coppola arrived at USP Lewisburg on August 17, 2015 to begin Level I of the SMU Program.  Mr. Coppola did not meet with a psychologist when he arrived at USP Lewisburg.

157.   Since arriving at USP Lewisburg, Mr. Coppola has not received a single mental health evaluation.  His treatment request forms have been denied or ignored.  His only contact with mental health staff at USP Lewisburg is through the cell-side conversations that last a matter of seconds.  Mr. Coppola's fears of torture

---

[30] Lithium is an antimanic agent medication used to treat and prevent episodes of mania in people with bipolar disorder.
[31] Thorazine (Chlorpromazine) is an antipsychotic medication primarily used to treat psychotic disorders such as schizophrenia.

and beatings prevent him from announcing any of his mental health issues to a

Psychology Staff member walking by the other side of his cell door, in a place

where prison staff and other men could easily overhear the conversation.

158.  Mr. Coppola was receiving Gabapentin[32] for his sciatica when he arrived at

USP Lewisburg.  He had heard the medication may also be a mood stabilizer, but

he was taken off of the medication on or around March 3, 2016 by Dr. Kevin

Pigos.  Mr. Coppola did not receive a replacement until or around December 15,

2016, when Dr. Edinger prescribed for him Duloxetine[33].

159.  In July 2016, Mr. Coppola submitted a request for treatment of his bipolar

disorder.  On July 29, 2016, Mr. Coppola's request was rejected.  The rejection

stated that Mr. Coppola's only current diagnosis was antisocial personality disorder

and that there is no evidence of a diagnosis of bipolar disorder during his

incarceration, although bipolar disorder is a lifelong condition without care.  The

rejection informed Mr. Coppola that if he was in fact experiencing specific

symptoms, he was welcome to discuss them with a psychologist during unit rounds

– the rounds that are conducted in full ear shot of other men and the very prison

staff that he believes have abused him.  In Mr. Coppola's experience, even

---

[32] As relevant here, Gabapentin is an anticovulsant medication used to help control seizures in people with epilepsy.  Gabapentin treats seizures by decreasing abnormal excitement in the brain.

[33] Duloxetine (Cymbalta) is a medication prescribed for major depressive disorder, generalized anxiety disorder, fibromyalgia and neuropathic pain.

expressing a desire to speak to a psychologist during rounds is fruitless. On at least one occasion, Mr. Coppola raised the issue of his bipolar disorder with Dr. Enigk, who told Mr. Coppola she would not argue with him about being bipolar because she "knows" he is not.

160.   On August 17, 2016, Mr. Coppola signed a form that indicated he had completed the SMU program. However, on August 28, 2016, Mr. Coppola was involved in a disciplinary incident that resulted in his placement in restraints for 22 hours, from which he still has marks on his wrists. Mr. Coppola filed a misconduct charge over the incident, but it was rejected at every level. As punishment for this incident and for his filing the misconduct charge, Mr. Coppola lost good time and was notified that his SMU completion had been "cancelled." After this incident, Mr. Coppola withdrew a lawsuit he had filed against the BOP for fear he would face additional, severe retaliation.

161.   On or around February 15, 2017, Mr. Coppola received an 18-month SMU evaluation from Dr. Enigk. The review took place in the shower. It appeared to Mr. Coppola that Dr. Enigk was relying on a checklist to conduct the evaluation and did not provide substantive treatment. Dr. Enigk asked Mr. Coppola questions such as how he feels his time at USP Lewisburg has been and what he (Mr. Coppola) could have done to improve his time at USP Lewisburg. This review again stated that Mr. Coppola's only diagnosis was antisocial personality disorder.

162.   Mr. Coppola has not received any medication for his bipolar disorder the entire time he has been in the prison system and no treatment for his diagnosis of antisocial personality disorder.  Despite the clear diagnosis of bipolar disorder he received in 1990, Mr. Coppola has never been diagnosed as bipolar by the prison system and has never received treatment for the disorder.  He has never received a psychological interview nor been pulled out of his cell for individual or group therapy.  Mr. Coppola has never spoken with the tele-psychologist during his time in the BOP

## CLASS ACTION ALLEGATIONS

163.   Plaintiffs bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2).  For those causes of action, Plaintiffs seek injunctive and declaratory relief applicable to members of the class, as defined below.

164.   Plaintiffs bring this action on behalf of the following class: All persons who were, as of the filing date of the complaint in this case, or are now, or will be in the future, confined to the custody of the United States Bureau of Prisons in the United States Penitentiary Lewisburg and suffer from a Serious Mental Illness or a Mental Illness, requiring treatment under one or more of the BOP's CARE levels as set forth in Program Statement 5310.16 (May 1, 2014).

    a.    "Serious Mental Illness" is a group of diagnoses that exist on a continuum of the broader category of mental illness.  The BOP, in

Program Statement 5310.16, defines certain diagnoses as Serious Mental Illness, and others as Mental Illness. An individual's diagnosis and treatment needs may vary over time. For purposes of this class definition, "Serious Mental Illness" means a diagnosis of one of the disorders listed in said Program Statement as those "generally classified as serious mental illness," *i.e.*, schizophrenia spectrum and other psychotic disorders, major depressive disorder (all types), or bipolar and related disorders, or a diagnosis of those disorders listed in said Program Statement as "often classified as serious mental illness," that result in significant functional impairment, *i.e.*, anxiety disorders, obsessive-compulsive and related disorders, trauma and stressor-related disorders, intellectual disabilities and autism spectrum disorders, major neurocognitive disorders, and personality disorders, regardless of the CARE level assigned to that individual for treatment purposes;

b.  "Mental Illness" are other illnesses recognized by BOP in Program Statement 5310.16 as existing in the continuum of diagnosed conditions requiring mental health treatment. For purposes of this class definition, "Mental Illness" means a diagnosis of a mental disorder defined in Program Statement 5310.16 as "a syndrome characterized by clinical significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning [and is] usually associated with significant distress or disability in social, occupational, or other important activities" that requires mental health services pursuant to CARE levels CARE2-MH, CARE3-MH or CARE4-MH, as set forth in Program Statement 5310.16.

c.  "CARE levels" means the mental health care levels used by the BOP to classify individuals based on their need for mental health services; levels CARE1- MH through CARE4-MH are described in detail in Program Statement 5310.16.

165.  Class action status for this litigation is proper under Rule 23(b)(2) because:

a.  The class is so numerous that joinder of all members is impractical. Due to the nature of the facility at issue and the mental health afflictions known to Plaintiffs and their counsel, upon information and belief, the total number of class members is dozens;

b.   There are questions of law and fact common to the class, including without limitation: whether Defendants' failure to maintain an adequate program for appropriate mental health evaluations at USP Lewisburg leads to a failure to provide constitutionally adequate mental health treatment to individuals with mental illness; whether Defendants violate their own written policies and procedures and the Constitution by placing individuals with serious mental illness in the SMU at USP Lewisburg; whether Defendants violate their own written policies and the Constitution by taking inappropriate disciplinary actions against individuals with mental illness; whether Defendants violate their own written policies and the Constitution by failing to maintain an adequate program to diagnose and treat individuals with mental illness at USP Lewisburg; whether class members are subject to harm as a result of Defendants' practices that fail to provide adequate treatment for individuals diagnosed with a mental illness, including a serious mental illness; and whether Defendants' repeated violations of numerous mental health policies have placed members of the class at risk for increased psychological and/or physical harm;

c.   Plaintiffs' claim is typical of the claim of the class, in that each named Plaintiff has at least one mental illness, sometimes a serious mental illness, for which he has not received appropriate treatment, and Plaintiffs' claim and the claim of the class arises from the same policies, practices, and procedures implemented by Defendants at USP Lewisburg;

d.   Plaintiffs and all members of the class have been similarly affected by Defendants' common course of conduct;

e.   Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Plaintiffs and the other class members; and

f.   Plaintiffs can adequately represent the interests of the class members and have retained counsel experienced in class action and prisoners' rights litigation.

166.   Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2).

## CLAIM FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Eighth Amendment to the United States Constitution – Failure to Treat (Asserted by Plaintiff Class)

167.  Plaintiffs incorporate by reference the foregoing paragraphs of this

Complaint as though fully set forth herein.

168.  The Eighth Amendment prohibits cruel and unusual punishment.

169.  Defendants' policies, practices, and procedures systemically violate the

Eighth Amendment rights of individuals with mental illness.  Such policies,

practices and procedures include, without limitation:

> a.  Confinement of individuals with mental illness in the SMU for conduct directly attributable to their mental illness;
> b.  A disciplinary system that does not consider a prisoner's serious mental illness and the impact of isolation in assessing whether to sanction the prisoner or, if so, the nature of the sanction;
> c.  Failure to provide minimally adequate psychiatric and psychological services to diagnosed individuals with mental illness in the SMU, resulting in unnecessary pain and suffering;
> d.  Refusal to consistently provide prescribed medications for treatment of psychiatric conditions
> e.  Maintenance of conditions in the SMU that exacerbate individuals' serious mental illness, including near-constant isolation with little if any human contact; and
> f.  Failure to make available, maintain, and utilize adequate therapeutic alternatives to the SMU.

170.  Defendants know or are deliberately indifferent to the fact that the numerous

individuals who have been diagnosed as having serious mental illness are placed in

the SMU for extensive time periods and that confinement in the SMU creates a

substantial risk that those individuals' mental illnesses will be exacerbated and that their mental health will deteriorate.  Defendants also know or are deliberately indifferent to the fact that the mental health treatment provided to individuals with mental illness in SMU is inadequate and results in the exacerbation or unnecessary prolongation of individuals' mental illnesses.

171.   The impact of long-term isolation in the SMU has been brought to Defendants' attention through numerous prisoner grievances and communications with individuals' rights advocacy organizations.  Nonetheless, Defendants have refused to take reasonable steps to correct this systemic violation of individuals' rights.

172.   Defendants have acted, or failed to act, with deliberate indifference to the health and safety of individuals with serious mental illness.  As a direct and proximate result of their acts and omissions, the Eighth Amendment rights of such individuals have been violated, are being violated, and will continue to be violated.

### PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

173.   Exercise jurisdiction over this action;

174.   Issue appropriate declaratory and injunctive relief to stop the constitutional

violations described above and to ensure that men housed in the SMU at USP

Lewisburg receive constitutionally adequate mental health care;

175.   Award reasonable attorneys' fees, litigation expenses, and costs pursuant to

42 U.S.C. § 1988;

176.   Grant such other relief as this Court deems just and proper.


Dated: June 9, 2017                           Respectfully submitted,


                                              _/S/ Alexandra Morgan-Kurtz___


                                              Alexandra Morgan-Kurtz
                                              PENNSYLVANIA INSTITUTIONAL
                                              LAW PROJECT
                                              PA ID No. 312631
                                              100 Fifth Ave, Suite 900
                                              Pittsburgh, Pa 15222
                                              (412) 434-6175
                                              amorgan-kurtz@pailp.org

                                              Kevin H. Metz (*pro hac vice pending*)
                                              Marissa R. Boynton (*pro hac vice pending*)
                                              LATHAM & WATKINS LLP
                                              555 Eleventh Street NW
                                              Washington, DC  20004
                                              Tel:  (202) 637-2200
                                              kevin.metz@lw.com
                                              marissa.boynton@lw.com

Philip Fornaci (*pro hac vice pending*)
**WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
& URBAN AFFAIRS**
11 Dupont Circle, NW, Suite 400
Washington, DC 20036
Tel: (202) 319-1000
Phil_fornaci@washlaw.org

*Attorneys for Plaintiffs*